Minister Louis Farrakhan, Nation of Islam v. Anti-Defamation League, et al., and Abraham Cooper, et al. Mr. Mohammed, I see you've reserved two minutes for rebuttal, and you can begin whenever you're ready. Thank you very much. May it please the Court, Counsels. My name is Sa'ad Ali Mohammed. To my left is Attorney Abdul Araf Mohammed, General Counsel for the Nation of Islam, and Attorney Michael Mohammed. First, thank you for this opportunity to argue. Second, with the Court's permission, I would like to offer a brief preamble to our constitutional arguments this morning that will help frame what it is that we have to say with the Court's permission. On July 4, 1930, when Master Farrakhan Mohammed, who we believe to be God in person, founded the Nation of Islam, one of the first things that he did was to remove the names of our former slave masters and give us his last name, Mohammed, as a sign that we belonged to him. Then he raised the Most Honorable Elijah Mohammed and gave him the mission of the spiritual, moral, and mental resurrection of the downtrodden and oppressed here in America. In the first seven years of the Most Honorable Elijah Mohammed's leadership of the Nation of Islam, the ADL tried to destabilize the nation and destroy the nation by sending in spies in the ranks to tell lies that then resulted in 82 members of the nation being arrested on trumped-up charges. But he persevered. But he knew he needed some help. And then in 1955, his help came by a young man named Louis, who eventually joined the nation, became a minister, and he named Farrakhan. And he told him that the name Farrakhan is a modern, up-to-date name of God. He then said to him, through you, I will get all of my people. Fast-forwarding to September of 1977, when God blessed Minister Farrakhan to stand back up to rebuild the nation. So, Mohammed, I don't want to interrupt you, but we have specific claims that we're really focused on today, and as you can see, we have limited time. So I just want to focus you on, as you know, they raised issues of standing with respect to a number of your claims, and I'm curious what your response is, that Morgan State's denial of the application to hold the event, what information is there in terms of it being fairly traceable to ADL, that what allegation do you have that they had any involvement in that? Sure. Well, part of what I was saying was going to the setting, just because at the end of the day, actions, we believe, were taken that we pled. And that's why in the judge's ruling, on page 12, she indicated that SAC fails to plead that the plaintiff's injury from Morgan State's refusal of his form is fairly traceable to the ADL. We did plead that. You can't plead it in a conclusion. You can't say ADL pressured them to do this. That's a conclusion. What facts do you have that they pressured Morgan State to deny Mr. Farrakhan's application to hold the event? Yes, sir. What fact? That's a conclusion. No problem. And following up on Judge Bianco's, if you could be very specific and point us to a particular paragraph in the complaint, I think that would help us follow along. Not a problem. With respect to Morgan State, if you go to paragraphs 276, 289, 290, and 293, we, in fact, articulated the actions that maybe the Court right now is saying are conclusory. But then I would draw the Court's attention to paragraphs 128 and 129, which is where we identified the written policy from the ADL that said, in so many words, that they were going to impose an obligation on those universities that would give Mr. Farrakhan a platform. So we would argue that we used the ADL's own words and applied it to what happened at Morgan State. But I think the question is whether they did succeed in imposing the obligation. Somebody could say I planned to impose an obligation, but the question is did they actually cause it. So maybe give us the paragraphs that show the connection between what ADL said they wanted to do and what happened. Again, particular paragraphs would be helpful.  I think that it would be fair to say that the notion to impose an obligation is also somewhat conclusory. So we're really looking for specific facts. Sure. To the extent that we're aware that discovery would provide those specific facts and that at the pleading stage. We're at the pleading stage. Help us. We know we're at the pleading stage. We understand that if you get past it, you get more in discovery. And I know you started giving us paragraphs like 276 and whatever, but you mentioned the numbers. But I think if you can engage with those paragraphs, tell us what in those paragraphs gets you past the pleading stage. We're at the level of specifics here. Certainly. Well, to the extent that as the Court is aware of the specific facts are in the control of the defendants, we do not. No, no. We're talking about what you have in the complaint. Sure. So what we allege was that we alleged that they either pressured the administration or threatened to lobby against the funding for Morgan State. That's specific. Yeah, but those are two different things. I guess when you say they either did one or the other. But we have no idea which. It sounds like you don't have any facts to support that one happened or the other happened. Well, I would argue. You're just reasoning from the fact that there was a denial that you're assuming that one or the other happened. But what facts do you have that suggest that one or the other, either of those things happened? Well, what we have is the allegation in the complaint, which was our burden to plead, not to prove. And so we did feel that we pled it at the pleading stage. In addition, I would offer this to the Court that, as the Court is very well aware, that it's not the Court's, not this Court's, but the district court's ability to believe what we said that warrants the denial. But it is, in fact, did we plead it. So we will offer that. We're clear the district court did not believe what we said in the accounts. But I would like to read what this Court has said in Vega v. Hempstead, which is, The Court must assume the factual allegations of the complaint to be true, even if they are doubtful, in fact. And the complaint may not be dismissed based on the judge's disbelief of a complaint's factual allegations. You still have to have a fact. For example, a fact would be we believe that ADL contacted Morgan State on this day, or you don't have to give a particular day, but that they had contacted them and they told them do not let him speak there or X, Y, and Z will happen to you as a university. Then we would not be able to believe or disbelieve whether that happened or not. We would accept that as true, and you would at least satisfy traceability. But you don't have anything like that. You just have this general idea that they don't want universities to allow anti-Semitic speakers, that they've stated that, and that you're saying that's fairly traceable to a decision by some university across the nation. So I guess any university that denied Mr. Farrakhan entry, you would say ADL is responsible for that, right, that injury, right? Well, I would say this. It is possible. But with respect to the point that the Court just made, that's the exact point that we made with respect to Vimeo, because we said, in fact, that Vimeo contacted, we believe, not Vimeo, the ADL contacted Vimeo, and we believe made threats to them to, in fact, have Minister Farrakhan. Where is that? What paragraph is that? Certainly. 352, Judge. I'm reading 352. Where does it say they contacted them? Certainly. So what we said. I may be misreading this. Just tell me if it says that they contacted Vimeo, because I don't think I see that. Sure. In that, just above that paragraph, Judge, we mentioned about Fox-Sol. And we talked about how we believe the ADL followed what they did. We said similarly. You see that in the words, similarly, as was stated above, that ADL contacted Fox-Sol based on their attempt to have the criterion not played. And then the next paragraph, when we started getting to traceability, we said similarly. So you're saying that 350 somehow incorporates by reference 348? But that's why we said similarly, to draw it down into that section. Yes. All right. Let me ask you about the defamation. Certainly. The courts have consistently, and we've cataloged them, said that a statement like racist, anti-Semitic is an opinion. I know you cite this recent case from Texas that allowed a motion to dismiss, but we're in New York. We follow New York law. Certainly. Overcoming the cases that have repeated. We said that those are non-actionable opinions. We do recognize what the Second Circuit has held with respect to racism, bigotry, and anti-Semitism. What we'd just like to offer to the Court is this. We believe there's a distinction between the word anti-Semite as well as bigotry and racism and xenophobic for this reason. Those three words, bigotry, racism, and xenophobia, there's no identification of what the substance is of the claim. With respect to anti-Semitism, colloquialism and common parlance narrows it down to one particular group, which are Jewish people. So to that extent, on the face of the words, there is specificity as to who is the subject. If you say racism, you have no idea. What does that change it from? Why does that make it not opinion? We're just offering, you know, of course, the first factor is whether or not it has a specific meaning. So the word in and of itself draws you to a particular group of people that it's talking about. Racism does not. You say it's more specific than bigotry. That's exactly. We're just offering that there's a distinction between that word and all the other words that have been found in the cases. What about the fact that, as they note in the statements you're challenging, I think almost in every one of them, they list Mr. Farrakhan's speeches and comments, which are the basis for them concluding that he's anti-Semitic. The Kanye West article, there's a list of statements. The letter to Ticketmaster about the Savior's Day event, there's a list of statements, including Mr. Farrakhan saying those who call themselves Jews who are not really Jews but are in fact Satan, among other comments. The one where he predicts another Holocaust. They have numerous statements, including his keynote address. So, again, we've said, New York courts have said, if you use the term, even assuming it's actionable in some situation, if you give the statements that are the basis for your belief, then the readers can make out their decision for themselves. So how do you get around those cases? Well, I would say this. Going to the statements that, some other statements that the court did not mention, the district court identified three statements that it identified on first blush, I think was the phrase, could be statements of fact. And if, at the pleading stage, the factual allegations are accepted as true and all reasonable inferences are drawn in the favor of the plaintiff, we would argue that that was not done with respect to the statements that the district court identified at first blush could, in fact, be statements of fact. So. Give me an example of what you're talking about.  It was, she said, Farrakhan predicts another Holocaust, as well as Jews. Yeah, but then she said what I just said, right? Didn't she say that because it in fact has all the statements by Mr. Farrakhan that are the basis for that, that it's not? But other statements that won't make a fact an opinion, the other statements are just in the same document. What we're saying is the statement was a statement of fact. That's what we pled, and that's what the district court, in fact, identified, at least as first blush, as was said. But if the inferences were drawn in the favor of the plaintiff, we would offer that with respect to these three statements, use the synagogue of Satan to demonize Judaism, refer to Jews as termites, which never happened, Farrakhan prediction of the Holocaust. With respect to those three statements for sure, we maintain that those are statements, are fact, and that the district court even, I'll say quasi-identified as such. All right. All right. You have just two minutes of rebuttal. Thank you. Thank you. Good morning, Your Honors. I'm Nathan Siegel, and I represent the Appellees Anti-Defamation League and Jonathan Greenblatt. And as I think the Court knows, we divide our time seven to three, and Ms. Perchik will speak on behalf of the other appellees. With respect to the Morgan State and Vimeo allegations of constitutional injury, they both come down to the same thing, which is that there are only two actual facts that are alleged in the complaint. Everything else is speculative inferences upon information and belief. One fact with respect to Morgan State, that in 1994, ADL issued a policy statement. Ironically, when you actually look at that policy statement, I don't think it matters, but the actual policy statement says we should not take a hard-line approach and pressure every organization not to host Minister Farrakhan. We need to take a more sort of case-by-case approach to ask that people insist that he speak responsibly when he does. But in any event, everything else is a speculative inference, including that ADL even had any knowledge that there was an application to Morgan State in the first place, let alone that it communicated. Secondly, on the Vimeo allegation, the only fact alleged is that Vimeo cited an ADL publication. Again, everything else is a speculative inference, that there was somehow some communication with Vimeo, et cetera, et cetera. If that's enough to confer standing, then essentially any time an advocacy organization has one of their publications cited by an organization that does something negative towards the plaintiff, that would be sufficient to confer standing. So on that basis alone, standing is simply not present. And the other constitutional claims fail to allege injury in fact. They all base, they're all entirely based on speculative injuries of future harm that aren't tied to any factual allegation at all, no single factual allegation that anyone has ever passed a law, proposed a law, communicated anything threatening to the nation of Islam, et cetera. With respect to the defamation claim, I'll just take the example of the Theracon Predicts Another Holocaust that Mr. Muhammad just discussed. I think what the district court said was anything can conceivably be a statement of fact, right? When you assert that somebody says something, that was a headline. But the point here is that the basis of the headline is disclosed in the article, right? In the article, it recounts that Theracon in a speech said, Minister Theracon said, a Jewish man approached him and said, we will never burn again in ovens. Mr. Theracon essentially rebuked him and said, hold it. The Bible says that the day will come that shall burn. As what? As an oven. So the headline is obviously an interpretation of what Mr. Theracon was saying, and the reader can decide for themselves whether or not rebuking a Jewish person who approaches and says, we will never burn in an oven again, essentially saying, well, not necessarily. Is or is not predicting another holocaust. And the same thing is true with respect to all the other statements. They're all explicitly disclosed, in many cases numerous examples. And finally, I would just point out that with respect to the defamation claims, or at least the last couple of defamation claims that involve characterizing what Minister Theracon said, the district court held correctly that there's no plausible allegation of actual malice, even if something could be construed as a statement of fact. The entire gist of the Second Amendment complaint is that for 40 years the ADL has maintained a consistent position in that it considers the words of Minister Theracon and some of the words of other leaders of the Nation of Islam to be anti-Semitic. Everything that they're alleging here is entirely consistent with that. It's the antithesis of actual malice. So unless the court has any more questions, if it doesn't, I'm happy to yield. Do you have any comments on the position taken by the Northern District of Texas that these days calling someone anti-Semitic is a statement of fact? Well, it's a little bit analogous. And full disclosure, I'm the attorney in that case, and we're waiting for our summary judgment motion to be decided. So we'll see what happens. But I think what the court said, the actual statement was that the plaintiff had peddled anti-Semitic beliefs. In other words, that the plaintiff had distributed some specific information. And I think what the court held was that, at least in the abstract, it's conceivable that that could be a statement of fact, that either the plaintiff had distributed something or he didn't. I think that's virtually exactly the words that Judge O'Connor used in that case. And that is not what we have here. This is an example of where a statement was made, and there were a myriad of disclosures of exactly what was meant. So while, you know, candidly, we would respectively disagree with the conclusion, even in that case, and I think it's inconsistent with a lot of the New York cases, nonetheless, even if that, you know, you were to be credited as New York law, the complaint here is simply different. It's premised on multiple disclosures of exactly what was meant. So in that case, if, for example, that plaintiff had made no statements at all, then it could be a statement. Exactly. That could be actionable because he didn't make any statements. That's right. Essentially, that's essentially what the court said. Either he made statements or he didn't. But that doesn't mean if he did make statements, whether they're anti-Semitic or not, would be necessarily actionable.  Yes. That's right. All right. Thank you for the clarification. Thank you. Mr. Muhammad, you have. . . I think we have one. Oh, I'm sorry. Yes. Oh, I'm sorry. First. Sorry about that. Good morning. I'm Julie Gertschick on behalf of the SWC Appellees. First, I would just like to address what Appellant said in trying to distinguish between a case law that talks about racist comments versus anti-Semitic. As I'm sure Your Honors know, New York law has not necessarily distinguished between the two. In fact, there. . . I'm sorry. Could you speak up a little bit? I'm having trouble hearing.  Is that better? Yes. Thank you. There are a number of cases, according to New York law, that specifically hold, specifically stating that referring to someone as anti-Semitic or similar is a protected opinion. So they are cited in briefs, but I will just mention Russell v. Davies, the comic strip promotions case, Morgan v. NYP Holdings, and they specifically address commenting that somebody is anti-Semitic versus racism or racist comments. Secondly, let me just say that Appellants noted that, specifically talked just now about the second statement that the SWC Appellees made saying that the phrase, synagogue of Satan was used to demonize Judaism. I'd like to clarify that synagogue of Satan was, of course, the statement that SWC Appellees were referring to. Demonized Judaism was simply the SWC Appellees' characterization of that statement. There is no question that synagogue of Satan was a statement made by Appellants, and it was a publicly disclosed fact in Minister Farrakhan's widely televised speech. So I think there is no question there that it was not a mixed opinion. Finally, I would just like to say that, overall, there can be no question of actual malice here. The Appellants have failed to plead anywhere that SWC Appellees actually knew of the falsity of any statements or that there is any evidence that they did so, and that is what they must plead. Thank you. I'll submit our briefs. All right. Two points very quickly. One, I would just offer that we maintain that we did plead it. It just comes down to believability, but there's something that we didn't address in the first part I want to bring up, and that deals with counts four and five. And we make a pretty big deal out of the statements of the mayor that said we need to stop the feeders of anti-Semitism. That statement to us does not come out of a vacuum. In 2022, the ADL, Director Emeritus, said in an article entitled Kanye and Kyrie Spread Farrakhan's Bigotry, that's paragraph 452 in the Second Amendment complaint, the byline says we no longer have the option to ignore it. The ADL has never ignored Minister Farrakhan. So the question becomes, what does that statement indicate? That indicates that there's something else that was in the works and planned that would constitute no longer ignoring it, because they have, as they said, tracked Minister Farrakhan for 40 years. The reason why I'm saying that is because the very next year is when the national strategy was promulgated. And, in fact, that's also when Mayor – And what injury has flowed from that? What injury – from the mayor saying we want to stop anti-Semitism, what injury has flowed from that that's fairly traceable to the ADL? Sure. What we're saying is the feeders of anti-Semitism. So the statement that Mr. Foxman made identified Minister Farrakhan and the Nation of Islam as the feeders of anti-Semitism because it says Kyrie Irving and Kanye West absorbed his anti-Semitism and are now spreading it. So that makes Minister Farrakhan and the Nation of Islam being labeled by them as feeders of anti-Semitism. Then the mayor says we have partnered with the ADL, and then his language is we must apprehend and prosecute the feeders of anti-Semitism. So at the end of the day – Has anyone been prosecuted? I'm sorry? Has anyone been prosecuted? Not at all, but what we also say – Has anyone, like, I don't know, received a target letter or been subject to search warrants? Is there any indication of any criminal investigations or prosecutions? No, but what we also – And when did this happen? When were these statements? In 2023 was Mayor Adams' statements. In 2022, before the national strategy, was Mr. Foxman's statements. So what's the showing of an impending injury or an actual current injury? Sure. As opposed to one that's simply speculative. Well, to the extent that Mayor Adams, when he mentioned that they are now going to use law enforcement, we took a press conference. That was said during a press conference, so we offer that the impendency nature of the actions would flow from him holding a press conference saying this is what we're about to do. And so I would just offer that in the case that we used in our briefs was Bennett v. Speer, and in that case the plaintiffs challenged a policy statement coming out of the Department of the Interior, and they were found to have standing, even though they had nothing to do with the biological opinion that came out of the Department of the Interior. But they were found to have standing because in the Endangered Species Act, there was a zone of interest created, and we will argue the same principle, which is if you have the ADL making these statements about translating it into feeders of anti-Semitism, partnering with the mayor, and the mayor saying we're going to prosecute them, then at the end of the day it's not the George Washington Bridge that we have to give over from one side to the other. It's very short to say we maintain that Aaron pled in the complaint that the individuals that the mayor was talking about apprehending and prosecuting were the same individuals that the ADL maintains are the feeders of anti-Semitism. Thank you very much. Thank you to everyone. We'll reserve a decision and have a good day.